DECISION
{¶ 1} Relator, Steven M. Hinojosa ("relator"), commenced this original action requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order to the extent that it finds that he *Page 2 
voluntarily abandoned his employment and to enter an amended order finding that relator did not voluntarily abandon his employment.
 {¶ 2} Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth Appellate District, this matter was referred to a magistrate who considered the action on its merits and issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate determined that the commission failed to explain its reasoning or to specify the evidence upon which it relied in determining that relator voluntarily abandoned his employment. Thus, the magistrate determined that the commission's order did not comply with State ex rel. Noll v.Indus. Comm. (1991), 57 Ohio St.3d 203, 567 N.E.2d 245. The magistrate recommended the court grant relator's request for writ of mandamus. The magistrate further recommended that the writ of mandamus order the commission to vacate its finding that relator voluntarily abandoned his employment, and in a manner consistent with the magistrate's decision, make a determination in compliance with Noll as to whether relator actually committed the offense for which he was discharged, and thereafter enter an appropriate finding as to whether relator voluntarily abandoned his employment.
 {¶ 3} No objections have been filed to the magistrate's decision.
 {¶ 4} Finding no error of law or other defect in the magistrate's decision we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law therein. In accordance with the magistrate's decision, a writ of mandamus is issued ordering the commission to vacate its finding that relator voluntarily abandoned his employment, and in a manner consistent with the magistrate's decision, make a determination in compliance with Noll as to whether relator actually committed the offense *Page 3 
for which he was discharged, and to enter an appropriate finding as to whether relator voluntarily abandoned his employment.
Writ of mandamus granted.
 McGRATH, P.J., and FRENCH, J., concur. *Page 4 
 APPENDIX A MAGISTRATE'S DECISION Rendered on October 24, 2007 IN MANDAMUS {¶ 5} In this original action, relator, Steven M. Hinojosa,[1]
requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate *Page 5 
its order to the extent that it finds that he voluntarily abandoned his employment and to enter an amended order finding that relator did not voluntarily abandon his employment.
Findings of Fact: {¶ 6} 1. On December 27, 2005, relator sustained an industrial injury while employed as a truck driver for respondent Wulff Enterprises, Inc. ("Wulff" or "employer"), a state-fund employer. The industrial claim is allowed for "sprain left shoulder; sprain neck," and is assigned claim number 05-892238.
 {¶ 7} 2. Earlier, on September 13, 2004, relator signed Wulff's "Employee Rules of Conduct" which states in part:
 Employees must avoid tardiness, absence, and departure from work early without the permission of their supervisors. Employees must observe time limitations on rest and meal periods. Every employee shall notify his or her supervisor or specified contact of an anticipated absence or lateness in accordance with Company and departmental procedures.
 * * *
 * * *
 Violation of any of these regulations may result in disciplinary action ranging from warning to discharge. The measure of discipline should correspond to the gravity of the offense as weighed by its potential effect on the Company as well as the seniority and work record of the employee involved, among other factors.
 {¶ 8} 3. On January 23, 2006, relator signed a Wulff document captioned "Official Warning." The warning states: Company Statement:
 Steve Hinojosa has violated company rules of conduct regarding absences and communication with the company and a condition of employment regarding personal phones. *Page 6 
 * * *
 Steve was absent on Tuesday, January 17th and did not call and report that he would not be at work. This is considered a "no call, no show." This re-occurred on Wednesday, January 18th and is considered a second occurrence of a "no call, no show." The company rules of conduct state that any anticipated absence or lateness must be reported to the employee's supervisor. Violation of this policy is not tolerated and is considered grounds for dismissal.
 These violations are extremely serious in nature and are grounds for dismissal. With these violations, together with recent DOT violations and a pattern of absences that has developed in 2005, Steve has put his employment in jeopardy.
Action Taken:
 1. Steve must review all company and departmental policies with manger, with special focus on attendance expectations, call off procedures and the company rules of conduct.
 2. Any improper absences may result in dismissal.
 3. Any actions that do not adhere to company policies or rules may result in dismissal.
 * * *
 I understand that my actions have placed my employment in jeopardy and I agree to follow all rules of conduct, company policies and all other rules and regulations that apply to my position. I will ask my manager if I have any questions or any uncertainty regarding what is expected of me.
 {¶ 9} 4. The record contains another Wulff document captioned "Official Warning" dated February 10, 2006. However, this document is not signed by relator. In actuality, it is a company memorandum, stating:
 Steve Hinojosa has violated company rules of conduct regarding unexcused absences.
 Steve Hinojosa did not call or report to work on Thursday, February 9 and Friday, February 10, 2006. This is the second occurrence in less than thirty (30) days. *Page 7 
 A Prior Official Written Warning occurred on January 23, 2006 in which Steve was informed of the serious nature of this violation and that his job may be in jeopardy.
 {¶ 10} 5. On February 17, 2006, relator's supervisor informed relator verbally that he was terminated from his employment. There is no letter or written document from the employer that officially states the basis for the firing.
 {¶ 11} 6. On a C-84 dated May 25, 2006, treating physician Michael Marvin, M.D., certified a period of temporary total disability ("TTD") beginning January 17, 2006 to an estimated return-to-work date of March 2, 2006, based upon an allowed condition of the claim.
 {¶ 12} 7. Following an August 9, 2006 hearing, a district hearing officer ("DHO") issued an order awarding TTD compensation beginning February 17, 2006. The DHO found that relator did not voluntarily abandon his employment.
 {¶ 13} 8. Wulff administratively appealed the DHO's order of August 9, 2006.
 {¶ 14} 9. On October 6, 2006, the administrative appeal was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
Following the hearing, the SHO issued an order that vacates the DHO's order. The SHO's order states in part:
 It is the order of the Staff Hearing Officer that temporary total compensation is specifically denied from 02/17/2006 through 10/06/2006.
 This order is based on a finding that claimant is ineligible for temporary total compensation as he voluntarily abandoned his employment when he was terminated on 02/17/2006.
 The claimant was terminated on 02/17/2006 after violating the company's no call/no show policy. *Page 8 
 The claimant was previously warned on 01/23/2006 that he violated the company's no call/no show policy. The 01/23/2006 warning references two unexcused absences as unacceptable and a violation of the absentee policy. The 01/23/2006 employee warning references two unexcused absences, 01/23/2006 [sic] and 01/18/2006. The warning clearly indicates the company rules of conduct [and] states that any anticipated absence or lateness must be reported to the employee's supervisor. The 01/23/2006 warning further indicates that violation of this policy is not tolerated and is considered grounds for dismissal.
 Moreover, the employer submitted the employee rules of conduct signed by the claimant on 09/13/2004.
 The Hearing Officer finds the employer has established the claimant is not entitled to temporary total compensation, pursuant to the decision set forth in State ex rel. Louisiana-Pacific Corporation v. Industrial Commission, 72 Ohio St.3d 401.
 The termination in this case occurred as a violation of a written work rule that clearly define the prohibited conduct. The Hearing Officer also finds the violation was previously identified by the employer as a dischargeable offense, pursuant to the employee rules of conduct signed by the claimant on 09/13/2004. The employer policy is also outlined in the 01/23/2006 warning which clearly indicates that violation of the policy is not tolerated and is considered grounds for dismissal.
 Given claimant's signature on the employee rules of conduct as well as the recent warning on 01/23/2006, the claimant should have known that a violation of the no call/no show policy could result in his termination.
 Thus, the Hearing Officer concludes the claimant is not entitled to the requested period of temporary total compensation.
 {¶ 15} 10. On October 26, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of October 6, 2006. *Page 9 
 {¶ 16} 11. On February 26, 2007, relator, Steven M. Hinojosa, filed this original action.
Conclusions of Law: {¶ 17} Two issues are presented: (1) did Wulff's "Employee Rules of Conduct" and the January 23, 2006 warning provide clearly defined prohibited conduct identified by the employer as a dischargeable offense, and (2) if the commission actually determined that relator committed the prohibited conduct for which he was discharged, does such determination comply with State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203?
 {¶ 18} The magistrate finds: (1) the employer clearly defined the prohibited conduct identified by the employer as a dischargeable offense, and (2) if the commission actually determined that relator committed the prohibited conduct for which he was discharged, such determination fails to comply with Noll. Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 19} A voluntary departure from employment precludes receipt of TTD compensation. An involuntary departure does not. In State ex rel.Louisiana-Pacific Corp. v. Indus. Comm. (1995), 72 Ohio St.3d 401, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
 * * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft [State ex rel. *Page 10 Ashcraft v. Indus. Comm. (1987), 34 Ohio St.3d 42] and Watts [State ex rel. Watts v. Schottenstein Stores Corp. (1993), 68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
 {¶ 20} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:
 Now at issue is Louisiana-Pacific's reference to a written rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
 The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the con-siderations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 21} In the instant case, the commission, through its SHO, relied upon the January 23, 2006 written warning in determining that the employer provided a written work rule or policy that clearly defined the prohibited conduct. It was proper for the SHO to rely upon the January 23, 2006 written warning that in effect supplemented Wulff's "Employee Rules of Conduct" in relator's case.
 {¶ 22} In [State ex rel.] Leaders Moving Storage Co. v. Indus.Comm., Franklin App. No. 05AP-455, 2006-Ohio-1211, at ¶ 22, this court stated: *Page 11 
 In prior opinions considering voluntary abandonment arguments based, in part, on written warnings, this court has considered those warnings in determining whether an employer's work rules sufficiently defined the prohibited conduct. See, e.g., State ex rel. Wal-Mart v. Riley, 159 Ohio App.3d 598, 2005-Ohio-521
(considering employee handbook, written corporate policies, and written warning); State ex rel. Abbott Foods, Inc. v. Indus. Comm., Franklin App. No. 03AP-1042, 2004-Ohio-4787 (considering employee handbook, written reprimand, and termination letter). Consideration of all applicable evidence, including the April 20 and August 24 reprimands, was also appropriate here. Without such consideration, both the commission's decision and the magistrate's decision were incomplete. * * *
 {¶ 23} Here, relator argues that Wulff never provided a written policy that clearly defines what constitutes a "no call/no show" nor specifies how many no call/no shows constitute dischargeable conduct.
 {¶ 24} In fact, the SHO's order of October 16, 2006 answers relator's argument. To reiterate, the SHO's order explains: "The claimant was previously warned on 01/23/2006 that he violated the company's no call/no show policy. The 01/23/2006 warning references two unexcused absences as unacceptable and a violation of the absentee policy."
 {¶ 25} The January 23, 2006 warning clearly indicated to relator that two consecutive no call/no shows was considered grounds for dismissal. Moreover, the January 23, 2006 warning clearly defined a no call/no show as occurring when claimant "did not call and report that he would not be at work."
 {¶ 26} However, relator was not fired for the two consecutive no call/no shows that occurred on January 17 and 18, 2006. Rather, relator was warned that the prohibited
 conduct would be treated as a dischargeable offense in the future. *Page 12 
 {¶ 27} Having properly determined that the employer provided to relator clearly defined prohibited conduct identified as a dischargeable offense, the commission's next task was to determine whether relator actually violated the no call/no show rule on February 9 and 10, 2006, as the employer alleged in its February 10, 2006 memorandum. Also, the commission was required under Noll to specifically state what evidence has been relied upon and briefly explain the reasoning for its decision.
 {¶ 28} We are thus confronted with the second issue. If the commission actually determined that relator committed the prohibited conduct for which he was discharged, does the determination comply withNoll?
 {¶ 29} The SHO's order of October 6, 2006, declares "[t]he claimant was terminated on 02/17/2006 after violating the company's no call/no show policy." Arguably, a finding that claimant was terminated on February 17, 2006, after violating the company rule, is not tantamount to a finding that relator violated the rule on February 9 and 10, 2006, as alleged in the company memorandum. If the SHO's order merely determined the employer's reason for the discharge, it is insufficient. To sustain a finding of voluntary abandonment, the commission itself must determine whether relator actually committed the prohibited conduct for which he was discharged.
 {¶ 30} Presumably, relator was discharged for the two consecutive no call/no shows of February 9 and 10, 2006, as reported in the Wulff memorandum dated February 10, 2006. Oddly, this memorandum is not mentioned in the SHO's order, nor is it cited as relied-upon evidence when it was the primary company evidence of the violation for which relator was discharged. *Page 13 
 {¶ 31} Moreover, at the October 6, 2006 hearing, under cross-examination, relator denied that he failed to call in on February 9, 2006. The hearing transcript presents the following exchange:
 Q. You indicated at the last hearing that you had attempted to call Ms. Kettering during the February time period when you weren't coming to work. Is that your testimony today?
 A. Yes.
 Q. And let's try to take that with some time frame here. You called in sick on February 7th, saying you were going to go to AultWorks in the afternoon, and you were given a return to work date of February 8th . Do you remember anything about that time period?
 A. Yeah.
 Q. You did not return to work on February 8th; do you remember that?
 A. No, I didn't.
 Q. And do you remember why not?
 A. Because I was still sore.
 Q. And did you call in in the morning?
 A. Yes, I did.
 Q. What time, do you remember?
 A. It had to be about 7:30 in the morning, I called in and I left a voice mail on Jim McWhorter's extension.
 Q. If I said there was a transcribed voice message saying you called in at 10:53, that you had just woken up because your medicine had made you extra drowsy, does that sound accurate? Does that refresh your recollection? Yes or no?
 A. Could have been, yes.
 Q. And then February 9th, that's the next day, do you think you called in again? *Page 14 
 A. I know I called in.
 Q. Who did you call this time?
 A. Jim McWhorter.
 Q. At the last hearing, you indicated that you called Joy. Are you changing that testimony?
 A. No. I called both; Joy Kettering, got her voice mail, and then I called Jim McWhorter's extension.
 Q. And where were you when you were making those phone calls?
 A. On those days, I was using a pay phone at — It's about a block from my home.
 Q. What time of the day was it?
 A. That was about — well, the first one was about 7:30 in the morning, and then I called again the next day, had to be about 8:30, 9 o'clock.
 Q. Did you leave messages both those days?
 A. Yes, I did.
 Q. Did you ever get in touch with an actual person?
 A. The only person I spoke to was Jim McWhorter, and that was about a week later when he showed up at my doctor's appointment.
 Q. I'm asking when you called in on these days, when you didn't show up for work.
 A. No.
 Q. And, I'm sorry, we'll have to be careful not to talk over each other. So your testimony is that, no, you never talked to an actual person?
 A. No.
 Q. And you didn't press zero for the operator? *Page 15 
 A. No.
 Q. You didn't ask anyone to be paged?
 A. No.
 Q. You called your — your testimony is that you did call during work hours?
 A. Yes.
 Q. After 8:00 a.m. in the morning. And yet you didn't make any special effort to get in touch with an actual person, despite not coming in February 8, 9, 10, 13 — that's the Monday again — is that true?
 A. Yeah, that's true.
 Q. All those days, and you didn't feel like it was important to talk to an actual person?
 A. No, I didn't. I figured a voice mail would be sufficient.
Tr. at 12-15.
 {¶ 32} While it is often said that it is the commission that weighs the evidence, the commission must indeed weigh the evidence and reach a determination when it is its task to do so. Relator's hearing testimony seriously challenged the factual allegations contained in the Wulff memorandum of February 10, 2006. Yet, the SHO's order is silent as to the testimony and the memorandum. Clearly, if the commission actually found that relator committed the conduct for which he was discharged, the commission has failed to explain its reasoning or to specify the evidence upon which it relied in violation of Noll.
 {¶ 33} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its finding that relator voluntarily abandoned his employment, and in a manner consistent with this magistrate's decision, make a determination in compliance with Noll as to whether relator *Page 16 
actually committed the offense for which he was discharged, and thereafter enter an appropriate finding as to whether relator voluntarily abandoned his employment.
[1] Apparently, relator's surname is incorrectly spelled on relator's complaint. On the commission's official records, relator's surname is Hinojosa. *Page 1