[Cite as *State v. Ross*, **2019-Ohio-2472.**]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. CT2018-0047 |
| | : | |
| BRYAN K. ROSS | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Muskingum County
Court of Common Pleas, Case No.
CR2018-0053

JUDGMENT:    AFFIRMED

DATE OF JUDGMENT ENTRY:    June 20, 2019

APPEARANCES:

For Plaintiff-Appellee:

D. MICHAEL HADDOX
MUSKINGUM CO. PROSECUTOR
TAYLOR P. BENNINGTON
27 North Fifth St., P.O. Box 189
Zanesville, OH 43702-0189

For Defendant-Appellant:

JAMES ANZELMO
446 Howland Drive
Gahanna, OH 43230

*Delaney, J.*

{¶1} Appellant Bryan K. Ross appeals from the June 12, 2018 Entry of the Muskingum County Court of Common Pleas. Appellee is the state of Ohio.

### FACTS AND PROCEDURAL HISTORY

{¶1} This case arose in October 2017 when Jane Doe was beaten, hog-tied, and terrorized by a group of people at her drug dealer's residence on Grace Avenue in Muskingum County. The following facts are adduced from the record of the trial of co-defendants Thundercloud and Ross.[1]

*Doe is beaten because she is a "snitch"*

{¶2} Jane Doe is an admitted chronic illegal drug user. She has had periods of sobriety, but was heavily addicted in October 2017. She lost custody of both of her children. Her husband, the father of the eldest child, died of a drug overdose. "Josh" is the father of her youngest child and is also a long-term drug abuser. Doe has numerous criminal convictions and has frequently violated probation due to "dirty" drug screens.

{¶3} In October 2017, Doe's drugs of choice were heroin and methamphetamine. She would alternate the two, using meth to stay awake and sustain the high from the heroin. Doe freely admits that during this period of her life, she spent all of her time getting high, or finding money to get high, and drugs were her only priority.

{¶4} Her dealer was Darnell Vann, known on the street and referred to at trial as "Smoke." Smoke had a house on Grace Avenue and Doe went there several times a day, every day. The house was usually full of people using heroin, methamphetamine, crack, and cocaine. Sometimes Josh accompanied Doe to Smoke's house to get high. Doe

---

[1] Thundercloud's appeal is 5th Dist. Muskingum No. CT2018-0048.

admittedly stole from family members to get money for drugs. Smoke would also give her lists of items to "boost," or steal from stores, which she would exchange for drugs.

{¶5} The instant case relates back to an incident in 2014. In May 2014, Doe was at a house in Crooksville when a drug bust occurred, resulting in the arrest of a dealer named T.J. Murphy. Doe was a witness against Murphy at his ensuing trial. In the wake of the trial, Doe and Josh occasionally heard rumors that Murphy had "put a hit out" on Doe.

{¶6} Life continued to spiral downward for Doe in the fall of 2017. She tested positive for fentanyl abuse and was arrested for receiving stolen property. She violated probation and lost custody of her children yet again. She was hospitalized for six weeks due to a hole in her spleen from chronic drug abuse. Nevertheless, upon her release from the hospital, she immediately sought out Smoke to get high. Doe bounced between living at Smoke's residence and with her parents in their one-bedroom apartment.

{¶7} Once while Doe was at Smoke's, a woman recognized her and told everyone in the house Doe "was the boys," meaning Doe was a police informant. Around this time Doe learned Smoke knew T.J. Murphy and had communicated with him about her whereabouts.

{¶8} Doe still constantly went to Smoke's residence despite Josh's renewed warnings that there was a "hit" out on her. At one point, she talked to Smoke about the threats and he told her there was nothing to worry about. He suggested they could "stage" something where it would appear Doe got "jumped." Everyone would benefit because Murphy would pay Smoke and Doe "would have the target off [her] back." Doe thought

the staging sounded like a good idea, but no plan was formulated and Doe told Smoke they would have to discuss it further to figure out the details.

{¶9} On October 27 and 28, 2017, Doe went to Smoke's residence to get high. There were several other people present. Among these were Smoke; Thundercloud, known as "Cherokee;" Ross, known as "Boone;" and Heather Chandler. Also present was Byron Goodrich, who died of an overdose before trial of the instant case.

{¶10} Doe intended to spend the night at Smoke's because she and Josh had fought. She used drugs and nodded off on the couch in the living room. She awoke to someone punching her in the face. At first Doe thought she was dreaming but became terrified as she realized she was being beaten. She was repeatedly punched and kicked, and was pulled off the couch onto the floor. At first one person was beating her, then it was several people. She felt a foot in her face. She tried to cover herself and urinated on herself as the assault continued. Finally, the beating stopped and someone told her to stop screaming.

{¶11} A gun was placed to the back of her head as she lay on the floor, and she was told to crawl into the kitchen on her hands and knees. Doe complied because she had no choice and thought she was going to die. She was crying and in pain from the beating, and heard people talking around her. Some threatened to kill her; someone threatened to take her into the basement to sodomize her. In the kitchen, she was instructed to lay flat with her arms and legs outstretched, and she was hog-tied with a spool of phone cord.

{¶12} Appellee's Exhibit 1 is a cell phone video of the attack as described by Doe.[2] Heather Chandler approaches Doe as she is asleep on the couch, and starts pummeling her. She drags Doe onto the floor and the men join in, kicking Doe. Boone places a gun to the back of Doe's head. Byron Goodrich films the beating and can be heard repeatedly stating, "What a beautiful day. Isn't it a beautiful day?" as Doe screams and the others make threats. Smoke directs the action and instructs Doe to crawl to the kitchen. Cherokee hog-ties her with phone cord. Doe visibly urinates upon herself during the course of the ordeal. The video stops after Doe is hog-tied.

{¶13} Doe didn't know the assault was filmed until afterward. Smoke untied her, gave her clean clothes, and told her to clean herself up. He also gave her some "dope." Doe followed his instructions and didn't leave the house because she was afraid and because she wanted to get high.

{¶14} After the assault, Doe was terrified and in pain. Her face and sides were throbbing, her lips were split, and she could barely speak. Her glasses were broken. She had blood on her clothing. She didn't call the police or seek medical attention because, as she testified, she learned her lesson about talking. Doe unequivocally testified that she did not agree to be assaulted or terrorized during this incident, nor did she plan to be. She was hurt and terrified throughout the assault and was not acting. She still suffers from ongoing nightmares and constant fear.

{¶15} Despite Doe's failure to report the incident, eventually police sought her out. Police executed a search warrant on Byron Goodrich's cell phone in an unrelated case

---

[2] The video was shown during the testimony of several witnesses at trial who narrated the action on the video and identified the individuals involved.

and found the video of the assault. Officers recognized the interior of Smoke's residence and some of the people on the video. Police tracked down Doe to find out what happened. During the course of the investigation, Doe was threatened repeatedly and police "put her somewhere safe," but she willingly left the safe place to get high.

*Accomplice testimony of Smoke and Chandler*

{¶16} Smoke and Chandler testified for appellee as part of plea bargains in their own cases. Their versions of the attack largely matched Doe's and filled in additional details.

{¶17} Smoke learned Doe "snitched" against Murphy and spoke to Murphy about Doe's whereabouts. Murphy told him to beat Doe. Smoke intended to comply with Murphy's request to get paid. He planned to make a fake video because he didn't want Doe to get seriously hurt. He thus intended to have a female "jump" Doe and to film the assault to show to Murphy. Smoke acknowledged he mentioned this plan to Doe a few weeks prior to the assault; Doe said she was interested but they would need to discuss it in greater detail.

{¶18} On October 27, Heather Chandler came to his residence to do Smoke's hair and to get high. Present in the basement with Smoke and Chandler were Goodrich, "Boone," and "Cherokee;" all were present when Smoke suggested to Chandler that she should beat Doe. According to Smoke, everyone else was "supposed to sit back." Chandler testified, though, that when Smoke held out a bag of "dope" as payment for the attack, everyone ran for the stairs, eager to get in on the beating to score drugs from Smoke.

{¶19} Chandler observed Doe asleep on the couch and started beating her. At first Smoke was filming, then Goodrich. Chandler dragged Doe off the couch and kicked her, and Goodrich and Cherokee joined in. Boone put a gun to the back of Doe's head. The group forced Doe to crawl into the kitchen, and Cherokee hog-tied her with a spool of phone cord. Boone kept a gun to her head the entire time. Smoke also had a gun in his hand at one point.

{¶20} Smoke testified that using guns had not been planned ahead of time and the assault spiraled out of control when the entire group got involved. He testified Doe's face was "beat up;" it was swollen and her lips were "busted." She was scared, crying, and begging them to stop. Smoke acknowledged someone suggested they should stab her in the head, and someone else said they should sodomize her.

{¶21} Smoke further testified that once the camera was turned off, Boone and Goodrich wanted to take Doe into the basement and kill her because she was a snitch. Smoke thought killing her was a bad idea because there were too many people in the house who knew about the assault. Smoke untied Doe and told her to clean herself up. He gave her clean clothes and some heroin.

{¶22} Smoke called Murphy and told him the assault was accomplished, but complained Murphy never paid him.

{¶23} Smoke testified Doe did not agree to the assault, was not aware it was going to happen, and did not consent to anything that occurred. He said that at first, he was "staging" the assault to look good on camera, but events were out of his control when everyone else got involved.

{¶24} Chandler testified that while she was beating Doe, she "blacked out" and didn't recall everything she did to Doe until she saw the video. Chandler acknowledged that she beat Doe with full force and was not "hitting her easy." Chandler also confirmed Boone wanted to kill Doe and Smoke tried to calm him down.

{¶25} After the beating of Doe, Smoke and Goodrich also beat up Josh while Doe sat by, crying. Goodrich pulled a gun on Josh and Smoke told him to beat Josh but not to kill him. Smoke acknowledged Josh was present weeks before when he discussed staging an assault with Doe, but Josh didn't think it was a good idea and didn't want any part of it.

{¶26} Despite the beatings at Smoke's residence, Doe and Josh continued to return regularly to get high.

*Indictment, trial, conviction, and sentence*

{¶27} Thundercloud ("Cherokee") and Ross ("Boone") were indicted as follows: Count I, kidnapping pursuant to R.C. 2905.01(A)(3), a felony of the first degree; Count II, aggravated robbery with a firearm specification pursuant to R.C. 2911.01(A)(1), a felony of the first degree; Count III, felonious assault with a firearm specification pursuant to R.C. 2903.11(A)(1), a felony of the second degree; Count IV, retaliation with a firearm specification pursuant to R.C. 2921.05(A), a felony of the third degree; and Count V, kidnapping with a firearm specification pursuant to R.C. 2905.01(A)(2), a felony of the first degree.[3] The firearm specifications are pursuant to R.C. 2941.145.

{¶28} Prior to trial by jury, appellee sought and was granted leave to nolle Counts II and V, including the firearm specifications. The trial court then re-numbered the counts

---

[3] Darnell R. Vann, Byron G. Goodrich, and Heather M. Chandler are also co-defendants.

for purposes of sentencing. Count I remained Count I, but Count II became felonious assault with a firearm specification pursuant to R.C. 2903.11(A)(1), a felony of the second degree (formerly Count III); Count III became retaliation with a firearm specification pursuant to R.C. 2921.05(A), a felony of the third degree (formerly Count IV).

{¶29} The matter proceeded to trial by jury. Both Thundercloud and Ross moved for judgment of acquittal pursuant to Crim.R. 29(A) upon the count of felonious assault, asserting appellee presented insufficient evidence of serious physical harm. The motions were overruled.

{¶30} Ross was thereupon found guilty as charged. The trial court sentenced Ross to an aggregate prison term of 23 years.

{¶31} Ross now appeals from the trial court's judgment entry of conviction dated June 12, 2018.

{¶32} Appellant raises four assignments of error:

**ASSIGNMENTS OF ERROR**

{¶33} "I. ROSS'S CONVICTIONS ARE BASED UPON INSUFFICIENT EVIDENCE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS I & 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶34} "II. ROSS'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS I & 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶35} "III.   THE TRIAL COURT ERRED BY FAILING TO MERGE ROSS'S KIDNAPPING AND FELONIOUS ASSAULT OFFENSES, IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

{¶36} "IV.   ROSS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."

**ANALYSIS**

I., II.

{¶37} Ross' first and second assignments of error are related and will be considered together.  He contends his conviction upon one count of felonious assault is not support by sufficient evidence and is against the manifest weight of the evidence.  He also argues his convictions upon one count each of retaliation and kidnapping are against the manifest weight of the evidence.  We disagree.

{¶38} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.  The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶39} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶40} Ross first challenges his conviction of felonious assault pursuant to R.C. 2903.11(A)(1), which states in pertinent part, "No person shall knowingly cause serious physical harm to another * * *." Ross argues appellee presented insufficient evidence of serious physical harm, which is defined by R.C. 2901.01(A)(5) as any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶41} "The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.'" *State v. Irwin,* 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996. We find the testimony of Doe and Smoke established that Doe sustained temporary, serious disfigurement in that her face was beaten and swollen, and her lips were split. Under certain circumstances, a bruise can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary serious disfigurement. *State v. Worrell,* 10th Dist. Franklin No. 04AP-410, 2005-Ohio-521, at ¶ 47–51, reversed on other grounds by *In re Criminal Sentencing Statutes Cases,* 109 Ohio St.3d 313, 847 N.E.2d 1174, 2006-Ohio-2109; see also, *State v. Payne,* 8th Dist. Cuyahoga 76539 (July 20, 2000) [bloody cut, swollen eye are temporary, serious disfigurement]*; State v. Plemmons–Greene,* 8th Dist. Cuyahoga No. 92267, 2010-Ohio-655, [black eye, bruising, swelling to right side of face, scratches on neck, and bruising on thighs and buttocks].

{¶42} We have reviewed the record of the trial, including the videotape which is appellee's Exhibit 1. Through the video, photographic stills from the video, and the testimony of Doe, Smoke, and Chandler, it is evident that Doe endured a prolonged

assault.  She was punched and kicked repeatedly.  She was threatened with stabbing, murder, and rape.  She testified that she was terrified and wanted to die because she thought her life was about to end.  As a result, she sustained broken glasses, a swollen face, and "busted" lips.  She was terrified and in pain; she described her face and sides as "throbbing," and said she could barely speak.  She did not seek medical attention, not because she didn't need it but because she was afraid to tell anyone about the assault. Doe testified she has suffers psychological problems from the attack because she constantly has to look over her shoulder, continues to have nightmares every night, and is still terrified.

{¶43} A reasonable person could find acute pain of such duration as to result in substantial suffering or involving any prolonged or intractable pain under R.C. 2901.01(A)(5)(e). Doe was in extreme pain during the beating as evidenced by the video, and Smoke and Chandler opined that she was in acute pain after the beating. The jury could reasonably find that she remained in a state of acute pain causing substantial suffering for the hours and even days after the beating.  See, *State v. Delgallo*, 7th Dist. Jefferson No. 06 JE 1, 2007-Ohio-1569, ¶ 24.

{¶44} In *Thompkins,* supra, 78 Ohio St.3d at 390, the Ohio Supreme Court reiterated our standard of review for determining whether the evidence sufficiently supports a criminal conviction: "A challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." It is axiomatic our inquiry into sufficiency does not

encompass the credibility of the witnesses, which is primarily for the trier of fact to determine. *State v. Yarbrough,* 95 Ohio St.3d 227, 231, 2002–Ohio2126, 767 N.E.2d 216, ¶ 79. Instead, the Court emphasized that "[i]n essence, sufficiency is a test of adequacy." *Thompkins,* supra, at 386.

{¶45} The issue in a sufficiency review concerns whether the evidence, if believed, would support the conviction. Having reviewed appellee's evidence in its entirety, we find the evidence presented, including the testimony of the victim and two of the perpetrators, if believed by the trier of fact, would support the guilty verdict upon the count of felonious assault.

{¶46} Ross was also convicted of one count of retaliation pursuant to R.C. 2921.05(A), which states in pertinent part, "[n]o person, purposely and by force or by unlawful threat of harm to any person * * *, shall retaliate against a * * * witness who was involved in a civil or criminal action or proceeding because * * * witness discharged the duties of the * * * witness."  He argues this conviction is against the manifest weight of the evidence because he did not act purposely because he claims the attack on Doe was staged.  As Ross concedes, though, there was ample evidence the attack was not staged. Doe denied knowing of the attack in advance, and Smoke admitted he had not discussed it with her beyond their preliminary discussion.

{¶47} The most compelling evidence to us, though, is the videotape of the attack. Even if any of the accomplices were played up their gangster personas for effect, it is evident that Doe's terror is real, as were the blows inflicted upon her.  Smoke testified although he initially "staged" the attack by filming it for Murphy's benefit, the attack quickly spiraled out of control when others in the house, including Ross, joined in when "dope"

was offered in payment. No one planned to use a gun, but Ross put a gun to the back of Doe's head, escalating the violence and risk immeasurably.

{¶48} Ross also summarily argues that his kidnapping conviction is against the manifest weight of the evidence because the incident was staged. We disagree. Ross was convicted of one count of kidnapping pursuant to R.C. 2905.01(A)(3), which states in pertinent part, "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o terrorize, or to inflict serious physical harm on the victim or another." We note the jury was instructed upon complicity ["to 'aid' or 'abet' means to support, assist, encourage, cooperate with, advise or incite…"]. The video established Ross was fully complicit in the kidnapping.

{¶49} Reviewing the evidence in the light most favorable to Ross we find every element of felonious assault, retaliation, and kidnapping. The minor deficiencies in the evidence Ross points to go to the credibility of the witnesses, which was for the trial court to resolve. The weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough,* 95 Ohio St.3d 227, 231, 2002–Ohio–2126, 767 N.E.2d 216, ¶ 79. We find Ross's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Any rational trier of fact could have found the essential elements of felonious assault, retaliation, and kidnapping proven beyond a reasonable doubt. This is not the exceptional case in which the evidence weighs heavily against a conviction.

{¶50} The first and second assignments of error are therefore overruled.

III.

{¶51} In his third assignment of error, Ross argues the trial court should have merged the felonious assault and kidnapping charges for purposes of sentencing. We disagree.

{¶52} A defendant may be indicted upon and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *State v. Carr,* 2016-Ohio-9, 57 N.E.3d 262, ¶ 42 (5th Dist.), citing *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 42. At sentencing, Ross argued his convictions of felonious assault and kidnapping should merge because, he argued, the offenses shared the same animus: Ross placing the gun to the back of Doe's neck. Appellee responded that the offenses were separate because Ross placed the gun to the back of her head and forced her to crawl into the kitchen where she was hog-tied. The tying-up, in appellee's estimation, was the act of kidnapping. The trial court agreed and found that the offenses did not merge.

{¶53} R.C. 2941.25 states as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may

contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶54} The question of whether offenses merge for sentencing depends upon the subjective facts of the case in addition to the elements of the offenses charged. *State v. Hughes*, 5th Dist. Coshocton No. 15CA0008, 2016-Ohio-880, 60 N.E.3d 765, ¶ 21. In a plurality opinion, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. *Id.* at ¶ 48. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. *Id.* at ¶ 49. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. *Id.* at ¶ 50. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge. *Id.* at ¶ 51.

{¶55} *Johnson's* rationale has been described by the Court as "incomplete." *State v. Earley,* 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11. The Court has further instructed us to ask three questions when a defendant's conduct supports multiple offenses: (1) were the offenses dissimilar in import or significance? (2) were they committed separately? and (3) were they committed with separate animus or motivation? *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. An affirmative

answer to any of the above will permit separate convictions. *Id.* The conduct, the animus, and the import must all be considered. *Id.*

{¶56} Appellate review of an allied-offense question is *de novo. State v. Miku*, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 70 (5th Dist.), citing *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

{¶57} Applying the first two questions in the instant case, the offenses were committed separately and the resulting harm from each offense was not the same. *Ruff,* supra, 2015-Ohio-995 at ¶ 31. Ross was complicit in the pummeling and kicking of Doe, took an active role in the kidnapping by placing a gun to the back of her head and forcing her to crawl into the kitchen, and kept the gun on her as she was hog-tied. Thus, the offenses are not similar in import and were committed separately. *Id.*

{¶58} The trial court did not err is refusing to merge the offenses of kidnapping and felonious assault.  Ross's third assignment of error is overruled.

IV.

{¶59} In his fourth assignment of error, Ross contends he received ineffective assistance of defense trial counsel because counsel did not move the trial court to waive the costs of the action.  We disagree.

{¶60} Ross argues that defense trial counsel was ineffective in failing to request a waiver of court costs.  This Court considered rejected appellant's argument in *State v. Davis*, 5th Dist. Licking No. 17-CA-55, 2017-Ohio-9445, and *State v. Harris*, 5th Dist. Muskingum No. CT2018-0005, 2018-Ohio-2257.  We note this issue is currently pending before the Ohio Supreme Court on a certified conflict between *Davis*, supra, and *State v. Springer*, 8th Dist. Cuyahoga No. 104649, 2017-Ohio-8861. *State v. Davis*, 152 Ohio St.

3d 1441, 2018-Ohio-1600.  See also, *State v. Mathis*, 5th Dist. Muskingum No. CT2018-0011, 2018-Ohio-4090, appeal allowed, 154 Ohio St.3d 1499, 2019-Ohio-345, 116 N.E.3d 154.

{¶61} We find no basis in the instant case to deviate from our prior rulings. Accordingly, we adhere to our prior precedent in Davis and Harris and overrule appellant's third assignment of error.

**CONCLUSION**

{¶62} Appellant's four assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.

By:  Delaney, J.,

Hoffman, J. and

Wise, Earle, J., concur.